**YOUNGSTOWN SHEET & TUBE CO. et al.**
**v. SAWYER, Secretary of Commerce**
**and nine other cases.***

Civil Actions Nos. 1550–52, 1635–52, 1539–52,
1647–52, 1732–52, 1700–52, 1549–52,
1581–52, 1624–52, 1625–52.

United States District Court
District of Columbia.
April 29, 1952.

See also 103 F.Supp. 978.

* EDITOR'S NOTE. On April 30, 1952, the United States Court of Appeals for the District of Columbia Circuit sitting in banc (Stephens, Chief Judge, and Edgerton, Clark, Wilbur K. Miller, Prettyman, Proctor, Bazelon, Fahey and Washington, Circuit Judges) entered an order directing that "the orders of the District Court granting the preliminary injunctions in these cases be, and they are hereby, stayed until 4:30 o'clock P. M., Daylight Saving Time, on Friday, May 2, 1952, and, if petitions for writs of certiorari in these cases have then been filed in the Supreme Court, then until the Supreme Court acts upon the petitions for writs of certiorari; and, if the petitions for writs of certiorari be de-

nied, then until the further order of this Court." Chief Judge Stephens and Circuit Judges Clark, Wilbur K. Miller and Proctor dissented. .

On May 1, 1952, an application to attach conditions to the stay order of the Court of Appeals was denied by the court sitting in banc. Chief Judge Stephens and Circuit Judges Clark, Wilbur K. Miller, and Proctor, dissented.

On May 2, 1952, the preliminary injunctions granted by the District Court were stayed by the Court of Appeals sitting in banc as previously ordered. Chief Judge Stephens, and Circuit Judges Clark, Wilbur K. Miller, and Proctor, dissented. See Sawyer v. United States Steel Co., 1952, — F.2d —.

John J. Wilson, John C. Gall, Washington, D. C., and J. E. Bennett, Youngstown, Ohio, for plaintiffs The Youngstown Sheet and Tube Co. and The Youngstown Metal Products Co.

Hogan & Hartson, by Edmund L. Jones and Howard Boyd, Washington, D. C., Gall, Lane & Howe, by John C. Gall, Washington, D. C., Jones, Day, Cockley & Reavis, by Luther Day and T. F. Patton, all of Cleveland, Ohio, for plaintiff Republic Steel Corporation.

James C. Peacock, Washington, D. C., Randolph W. Childs, and Edgar S. McKaig, Philadelphia, Pa., for plaintiff E. J. Lavino & Company.

Breed, Abbott & Morgan, New York City, by Joseph P. Tumulty, Jr., Washington, D. C., and Charles H. Tuttle, New York City, for plaintiff Armco Steel Corporation.

Cravath, Swaine & Moore, by Bruce Bromley, New York City, Wilmer & Broun, by E. Fontaine Broun, Washington, D. C., for Bethlehem Steel Co.

Jones, Day, Cockley & Reavis, Cleveland, Ohio, by Sturgis Warner, Washington, D. C., H. Parker Sharp, Reed, Smith, Shaw & McClay, by John C. Bane, Jr., and Walter T. McGough, all of Pittsburgh, Pa., for plaintiff Jones & Laughlin Steel Corporation.

Davis, Polk, Wardwell, Sunderland & Kiendl, by John W. Davis and Theodore Kiendl, New York City, Covington & Burling, by John Lord O'Brian and Howard C. Westwood, Washington, D. C., and Roger M. Blough, Pittsburgh, Pa., for plaintiff United States Steel Co.

Holmes Baldridge, Asst. Atty. Gen., of the United States, Marvin C. Taylor and Samuel D. Slade, Attorneys, Dept. of Justice, Washington, D. C., for defendant.

PINE, District Judge.

By Executive Order 10340, promulgated April 8, 1952, the President of the United States directed defendant to take possession of such plants of companies named in a list attached thereto as he deemed necessary in the interests of national defense, to

operate them or arrange for their operation, and to prescribe the terms and conditions of employment under which they should be operated. The plaintiffs are among those named in the list. In the recitals of the Executive Order, the President stated that a controversy had arisen between certain companies producing and fabricating steel and certain of their workers represented by the United Steel Workers of .America, C.I.O., regarding terms and conditions of employment; that the controversy had not been settled through the processes of collective bargaining or through the efforts of the Government, and a strike had been called for April 9, 1952; that a work stoppage would immediately jeopardize and imperil our national defense and the defense of those joined with us in resisting aggression; and that in order to insure the continued availability of steel it was necessary that the United States take possession of and operate the plants. By virtue of this Executive Order, defendant issued his Order No. 1 bearing the same date, stating that he deemed it necessary in the interest of national defense that possession be taken of the plants of the companies named in a list attached to his order, including the plants of plaintiffs, and that therefore he did take possession of the same, effective April 8, 1952. By the same order, he designated the president of each company as operating manager for the United States until further notice, and directed him to operate the plants of such company, subject to defendant's supervision. Telegraphic notification to this effect was given to the president of each company.

Plaintiffs thereupon brought these actions praying for declaratory judgments and injunctive relief, and there are now before me for decision motions for temporary injunctions seeking to restrain the defendant from taking any action under the authority of the Executive Order. These motions were combined for hearing and have been fully heard. Voluminous briefs have been filed and considered. At the hearing, plaintiff United States Steel limited its motion to a preservation of the status quo in respect of terms and conditions of employment.

Plaintiffs contend that defendant's acts under the Executive Order resulting in the seizure of their plants are without authority of law and constitute an illegal invasion of their property and rights, and that they are entitled to preliminary injunctions to restrain defendant from acting thereunder, particularly in the light of his threat to make changes in terms and conditions of employment. The basis of plaintiffs' contention is that there is no constitutional or statutory right in the President to issue the Executive Order, and there being none, defendant acting thereunder is acting without legal authority and his acts are illegal and contrary to law. Plaintiff Lavino has urged an additional reason, namely, that it has been improperly included among the plants seized.

Defendant contends in his Opposition to the motions that the breakdown of collective bargaining negotiations "created an immediately impending national emergency because interruption of steel manufacture for even a brief period would seriously endanger the well-being and safety of the United States in a critical situation"; that the President has "inherent power in such a situation to take possession of the steel companies in the manner and to the extent which he did by his Executive Order"; that the courts are without power to negate Executive action of the President by enjoining it; that the courts will not interfere in advance of a full hearing on the merits except upon a showing that the damage to flow from a.refusal of a temporary injunction is irreparable and outweighs the harm which would result from its issuance; and that, since the right of the companies to recover all damages resulting from the taking has been recognized by Supreme Court decisions, there is no showing that the companies' legal remedy is inadequate or that their injury is irreparable.

Before proceeding to a discussion of the points of law involved herein, it should be said that the merits of the controversy between plaintiffs and the United

Steel Workers of America, C.I.O., are not before the Court for adjudication. Further, it should be noted that, although there is no law of the case rule in interlocutory orders in this jurisdiction, these cases are in a materially different posture than they were when Judge Holtzoff of this court refused a temporary restraining order in respect of several of them.

The fundamental issue is whether the seizure is or is not authorized by law. In my opinion, this issue should be decided first, and that I shall now do.

 There is no express grant of power in the Constitution authorizing the President to direct this seizure. There is no grant of power from which it reasonably can be implied. There is no enactment of Congress authorizing it. On what, then, does defendant rely to sustain his acts? According to his brief, reiterated in oral argument, he relies upon the President's "broad residuum of power" sometimes referred to as "inherent" power under the Constitution, which, as I understand his counsel, is not to be confused with "implied" powers as that term is generally understood, namely, those which are reasonably appropriate to the exercise of a granted power.[1]

This contention requires a discussion of basic fundamental principles of constitutional government, which I have always understood are immutable, absent a change in the framework of the Constitution itself in the manner provided therein. The Government of the United States was created by the ratification of the Constitution. It derives its authority wholly from the powers granted to it by the Constitution, which is the only source of power authorizing action by any branch of Government. It is a government of limited, enumerated, and delegated powers.[2] The office of President of the United States is a branch of the Government, namely, that branch where the executive power is vested, and his powers are limited along with the powers of the two other great branches or departments of Government, namely, the legislative and the judicial.[3]

The President therefore must derive this broad "residuum of power" or "inherent" power from the Constitution itself, more particularly Article II thereof, which contains the grant of Executive power. That Article provides that the Executive power shall be vested in the President; that he shall swear that he will faithfully execute the office of President and will to the best of his ability preserve, protect, and defend the Constitution of the United States, Sec. 1; that he shall be commander in chief of the army and navy of the United States, Sec. 2; and that he shall take care that the laws be faithfully executed, Sec. 3. These are the only sections which have any possible relevancy, and their mere enumeration shows the utter fallacy of defendant's claim. Neither singly nor in the aggregate do they grant the President, expressly or impliedly, as that term has hereinabove been defined, the "residuum of power" or "inherent" power which authorizes him, as defendant claims, to take such action as he may deem to be necessary, including seizure of plaintiffs' properties, whenever in his opinion an emergency exists requiring him to do so in the public interest.[4] Instead, in Con-

1. McCulloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579.

2. McCulloch v. Maryland, supra; Dorr v. United States, 195 U.S. 138, 140, 24 S. Ct. 808, 49 L.Ed. 128; Graves v. New York ex rel. O'Keefe, 306 U.S. 466, 477, 59 S.Ct. 595, 83 L.Ed. 927; Scott v. Sandford, 19 How. 393, 401, 60 U.S. 393, 15 L.Ed. 691.

3. Ex parte Quirin, 317 U.S. 1, 25, 63 S. Ct. 2, 9, 87 L.Ed. 3; Ex parte Milligan, 4 Wall. 2, 136–137, 18 L.Ed. 281; Lichter v. United States, 334 U.S. 742, 779, 68 S.Ct. 1294, 92 L.Ed. 1694. Amend-

ment IX to the Constitution provides that the enumeration therein, of certain rights, shall not be construed to deny or disparage others retained by the people, and Amendment X provides that the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

4. The Supplemental Memorandum of defendant, received April 29, 1952, after argument, states that he does not go beyond claiming "that the President possesses the constitutional power and duty to take

gress is lodged, within Constitutional limitations, the power to "provide for the common defense and general welfare", Art. I, Sec. 8.

■■ The non-existence of this "inherent" power in the President has been recognized by eminent writers, and I cite in this connection the unequivocal language of the late Chief Justice Taft in his treatise entitled "Our Chief Magistrate and His Powers" (1916) wherein he says: "The true view of the Executive function is, as I conceive it, that the President can exercise no power which cannot be fairly and reasonably traced to some specific grant of power or justly implied and included within such express grant as proper and necessary to its exercise. Such specific grant must be either in the Federal Constitution or in an Act of Congress passed in pursuance thereof. There is no undefined residuum of power which he can exercise because it seems to him to be in the public interest, and there is nothing in the Neagle case, [infra], and its definition of a law of the United States, or in other precedents, warranting such an inference. The grants of Executive power are necessarily in general terms in order not to embarrass the Executive within the field of action plainly marked for him, but his jurisdiction must be justified and vindicated by affirmative constitutional or statutory provision, or it does not exist."

I stand on that as a correct statement of the law. Defendant, realizing the untenable position in which that statement places him, attempts to weaken it by referring to statements made by Chief Justice Taft in Myers v. United States, 1923, 272 U.S. 52, 164, 47 S.Ct. 21, 41, 71 L.Ed. 160, wherein the Court sustained the President's authority to remove a postmaster appointed with the advice and consent of the Senate, but all that the Court held was that Article II granted the President "the executive power of the Government, i. e., the general administrative control of those executing the laws, including the power of appointment and removal of executive officers—a conclusion confirmed by his obligation to take care that the laws be faithfully executed." I see in that decision nothing inconsistent with his previous pronouncement, in that he traces the authority to a specific power granted to the President; but apparently fearing that someone might read certain obiter in the Myers case as contrary thereto, as defendant now does, the Supreme Court, in Humphrey's Executor v. United States, 1935, 295 U.S. 602, 626, 55 S.Ct. 869, 873, 79 L.Ed. 1611, in a unanimous opinion written by Mr. Justice Sutherland, removed any doubt with respect thereto, in the following language: "In the course of the opinion of the Court [in the Myers case], expressions occur which tend to sustain the Government's contention, but these are beyond the point involved and, therefore, do not come within the rule of *stare decisis*. Insofar as they are out of harmony with the views here set forth, these expressions are disapproved." And the view set forth in that opinion was that the President had no power to remove a member of the Federal Trade Commission by reason of the fact that he was a member of a quasi-legislative and quasi-judicial agency of government and not a purely executive officer as was Myers.

This would seem to dispose of defendant's contention that the Supreme Court differed from the hereinabove quoted views of Chief Justice Taft.

■ But defendant goes further and says there is no lack of judicial recognition of this "flexible executive power" to seize property without authority of a statute, and he cites, in support of this statement, the following cases: Roxford Knitting Co. v. Moore & Tierney, 2 Cir., 265 F. 177, 179, 11 A.L.R. 1415; but that case involved power exercised under a war statute. Employers Group of Motor Freight Carriers, Inc., v. National Labor Board, 79 U.S.App. D.C. 105, 107, 111, 143 F.2d 145, 147, 151; but that likewise involved a war statute, and no rights had been taken or threatened

action in a grave national emergency such as existed here." This statement relates his claim to the instant case, but does not change his general basic claim

as above set forth, which he necessarily must assert to sustain his defense herein.

to be taken which required review of the Board's order. Alpirn v. Huffman, D.C. Neb., 49 F.Supp. 337; but that likewise was under a statute authorizing the President during the national emergency to make requisitions. United States v. Pewee Coal Co., Inc., 341 U.S. 114, 71 S.Ct. 670, 95 L.Ed. 809, where there was a non-statutory seizure during World War II, and where compensation was allowed; but he neglected to state that the legality of the seizure was not in issue in the case. Ct.Cl., 88 F.Supp. 426. These cases are therefore not apposite.

He next cites general language from the works of Alexander Hamilton, Vol. 4, page 438, but it is far from convincing when read in context. He thereafter cites In re Neagle, 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55, involving a habeas corpus proceeding brought by Neagle, a United States Marshal who killed David S. Terry in defense of Judge Stephen J. Field, but that case traced the source of power in the Executive to Article II, Sec. 3, requiring that he shall "take care that the laws be faithfully executed." He also cites the Prize Cases (The Amy Warwick) 2 Black 635, 17 L.Ed. 459, but that simply upheld the validity of President Lincoln's blockade of southern ports and was predicated upon the existence of a state of war, which is not claimed by defendant to exist. He also cites In re Debs, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092, concerning the dispatch of troops by President Cleveland in a labor dispute, for the purpose of enforcing the faithful execution of the laws of the United States and the protection of its property and removing obstructions to interstate commerce and the United States mail. There, again, the authority is traced to an express grant of power. These cases therefore do not support his contention, but refute it. He next refers to seizures by former presidents, some during war and several shortly preceding a war, without the authority of statute, but it is difficult to follow his argument that several prior acts apparently unauthorized by law, but never questioned in the courts, by repetition clothe a later unauthorized act with the cloak of legality. Apparently, according to his theory, several repetitive, unchallenged, illegal acts sanctify those committed thereafter. I disagree.

[redacted] Defendant also contends that the Executive has an inherent power in the nature of eminent domain, which justifies his action. The power of eminent domain is a Congressional power. As stated by the Supreme Court in Hooe v. United States, 218 U.S. 322, 323, 336, 31 S.Ct. 85, 89, 54 L.Ed. 1055, "The taking of private property by an officer of the United States for public use, without being authorized, expressly or by necessary implication, to do so by some act of Congress, is not the act of the Government." The President therefore does not have the power of eminent domain, and the cases defendant cites do not disclose that he has anything in the nature of such power. Instead, they relate to the right of the Government to take and destroy property in connection with military operations. They set forth the stringent requirements for the exercise of this right and hold that, in some instances, there is an obligation, "upon the general principle of justice," to pay therefor. United States v. Pacific R. R., 120 U.S. 227, 7 S.Ct. 490, 496, 30 L.Ed. 634. These cases have no application to the issues here involved, and there is no merit to this point.

[redacted] Defendant also quotes from the autobiography of President Theodore Roosevelt at pages 388–389, wherein he states that it was "not only his right but his duty [as President] to do anything that the needs of the Nation demanded unless such action was forbidden by the Constitution or by the laws"; and that he "acted for the public welfare * * * acted for the common well-being of all our people, whenever and in whatever manner was necessary, unless prevented by direct constitutional or legislative prohibition." That is defendant's only support for his position and for his "Stewardship" theory of the office of President, but with all due deference and respect for that great President of the United States, I am obliged to say that his statements do not comport with our recognized theory of government, but with a theory with which our govern-

576

ment of laws and not of men is constantly at war.

 Enough has been said to show the utter and complete lack of authoritative support for defendant's position. That there may be no doubt as to what it is, he states it unequivocally when he says in his brief that he does "not perceive how Article II [of the Constitution] can be read * * * so as to limit the Presidential power to meet all emergencies," and he claims that the finding of the emergency is "not subject to judicial review." To my mind this spells a form of government alien to our Constitutional government of limited powers. I therefore find that the acts of defendant are illegal and without authority of law.

 I shall next turn to defendant's claim that the courts are without power to negate executive action of the President. Defendant relies on the case of Mississippi v. Johnson, 4 Wall. 475, 71 U.S. 475, 18 L.Ed. 437, where the Supreme Court held that the Judiciary would not attempt to control the President. But in this case the President has not been sued. Charles Sawyer is the defendant, and the Supreme Court has held on many occasions that officers of the Executive Branch of the Government may be enjoined when their conduct is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment. Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628; Land v. Dollar, 330 U.S. 731, 67 S.Ct. 1009, 91 L. Ed. 1209; Philadelphia Co. v. Stimson, 223 U.S. 605, 32 S.Ct. 340, 56 L.Ed. 570; United States v. Lee, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171. There is no doubt, therefore, that the defendant is subject to an injunction, and the President not only is not a party but he is not an indispensable party to this action, as held in Williams v. Fanning, 332 U.S. 490, 68 S.Ct. 188, 92 L.Ed. 95; Hynes v. Grimes Packing Co., 337 U.S. 86, 69 S.Ct. 968, 93 L. Ed. 1231. I find this point no bar to plaintiff's claim to relief.

 Taking up the next point, namely, that the courts will not interfere in advance of a full hearing on the merits [5] except upon a showing that the damage to flow from a refusal of a temporary injunction is irreparable and that such damage outweighs the harm which would result from its issuance, I first find as a fact, on the showing made and without burdening this opinion with a recital of facts, that the damages are irreparable. As to the necessity for weighing the respective injuries and balancing the equities, I am not sure that this conventional requirement for the issuance of a preliminary injunction is applicable to the case where the Court comes to a fixed conclusion, as I do, that defendant's acts are illegal. On such premise, why are the plaintiffs to be deprived of their property and required to suffer further irreparable damage until answers to the complaints are filed and the cases are at issue and are reached for hearing on the merits? Nothing that could be submitted at such trial on the facts would alter the legal conclusion I have reached. But assuming I am required to balance the equities, what is the situation in which I find this case? I am told by defendant of the disastrous effects on our defense efforts and economy if an injunction should be granted, because it would automatically be followed by a crippling strike; and I am asked to weigh that damage against the incalculable and irreparable injuries to plaintiffs' multi-billion-dollar industry, if I should refuse to issue it. Assuming the disastrous effects on the defense effort envisioned by the defendant, that can come about only in case of a strike, and that presupposes that the United Steel Workers will strike notwithstanding the damage it will cause our defense effort. It also presupposes that the Labor Management Relations Act, 1947, 29 U.S.C.A. § 141 et seq., is inadequate when it has not yet been tried, and is the statute provided by Congress to meet just such an emergency. And it further presupposes, as defendant apparently does, that, this statute being inadequate, Congress will fail in its duties, under the

5. Expedition of a hearing on the merits has been opposed by defendant.

Constitution, to legislate immediately and appropriately to protect the nation from this threatened disaster. I am unwilling to indulge in that assumption, because I believe that our procedures under the Constitution can stand the stress and strains of an emergency today as they have in the past, and are adequate to meet the test of emergency and crisis.

Under these circumstances I am of the opinion that, weighing the injuries and taking these last-mentioned considerations into account, the balance is on the side of plaintiffs. Furthermore, if I consider the public interest from another viewpoint, I believe that the contemplated strike, if it came, with all its awful results, would be less injurious to the public than the injury which would flow from a timorous judicial recognition that there is some basis for this claim to unlimited and unrestrained Executive power, which would be implicit in a failure to grant the injunction. Such recognition would undermine public confidence in the very edifice of government as it is known under the Constitution.

The remaining claim of defendant is that plaintiffs have a plain, adequate, and complete remedy by a suit in the Court of Claims for damages, and therefore equity can not take cognizance of the case. The records show that monetary recovery would be inadequate; but aside from that, the seizure being unauthorized by law, there could be no recovery under an implied contract,[6] and there can be none under the Federal Tort Claims Act.[7] This Act expressly provides that any claim based upon an act of an employee of the Government in the execution of a regulation, whether or not it be valid, is excepted from its terms.[8]

For the foregoing reasons I am of the opinion that preliminary injunctions restraining defendant from acting under the purported authority of Executive Order 10340 should be issued in favor of all plaintiffs except the United States Steel Company. That company verbally limited its motion to one for a preliminary injunction to restrain defendant from making any changes in the terms and conditions of employment. That I am unwilling to issue because of its stultifying implications. I could not consistently issue such an injunction which would contemplate a possible basis for the validity of defendant's acts, in view of my opinion hereinabove expressed, and moreover, a preliminary injunction should maintain the status quo as of the date of the wrongful acts complained of. If the United States Steel Company wishes to withdraw its verbal amendment and proceed on the basis of its original motion, leave will be granted for that purpose, and the same injunction issued to it as to the other plaintiffs.

Counsel will submit, with all due speed, orders in accordance herewith.

---

6. Hooe v. United States, supra; United States v. North American Transportation & Trading Co., 253 U.S. 330, 40 S.Ct. 518, 64 L.Ed. 935.

7. 28 U.S.C.A. § 1346(b).

8. See Old King Coal Co. v. United States, D.C.S.D.Iowa, 88 F.Supp. 124; Jones v. United States, D.C.S.D.Iowa, 89 F.Supp. 980.