303 F.Supp. 894 (1969)
The CENTRAL PRESBYTERIAN CHURCH, a Corporation, and J. Layton Mauze, Jr., Robert P. McDonald, Charles W. McAlpin, II, G. Gordon Hertslet, Robert E. Siemens, Edmund J. Barker, and Charles J. Moore, Jr., as Individuals and as Representatives of the Members of the Central Presbyterian Church, Plaintiffs,
v.
BLACK LIBERATION FRONT, a Voluntary Unincorporated Association, James H. Rollins, and Ocie Pastard, as Individuals and as Representatives of the Members of Black Liberation Front, Defendants.
No. 69 C 196(2).
United States District Court E. D. Missouri, E. D.
August 25, 1969.
*895 Albert E. Schoenbeck, Thomas L. Croft, Brainerd W. LaTourette, Jr., and James F. Mauze, St. Louis, Mo., for plaintiffs.
Murry A. Marks, Elliott & Marks, St. Louis, Mo., for defendants.

MEMORANDUM
MEREDITH, District Judge.
Plaintiff, The Central Presbyterian Church, is a Missouri corporation, organized and existing under the laws of the State of Missouri for religious purposes. It has a membership of approximately two thousand, the majority of whom are white. It is affiliated with the United Presbyterian Church in the United States, and owns a church building located at 801 Hanley Road, Clayton, Missouri.
Plaintiff J. Layton Mauze, Jr., is one of the ministers of the church. *896 Plaintiffs Robert P. McDonald, Charles W. McAlpin, II, G. Gordon Hertslet, Robert E. Siemens, Edmund J. Barker, and Charles J. Moore, Jr., are officers and members, and bring this action as individuals and representatives of the members of said church, and these said plaintiffs fairly and adequately represent the members of said church.
Defendant Black Liberation Front is a voluntary unincorporated association. Its membership includes individuals and organizations. The defendants James H. Rollins and Ocie Pastard are members of the Black Liberation Front; Rollins is the chairman and Pastard is a leader in the organization. They fairly and adequately represent the membership of the Black Liberation Front. Other organizations known as The Zulus, Black Defenders, and Black Nationals are organizations that are also members of the Front.
Ocie Pastard is also the executive director of the Mid-City Community Congress, located at 4007 Delmar, St. Louis, Missouri. This is a Missouri corporation, which has been supported by a grant from the Department of Education of the United States in the amount of $100,000, from the Danforth Foundation in the amount of $25,000, and from I.F.C.O. in the amount of $3,000. The Black Liberation Front uses the Mid-City Community Congress headquarters as its offices and a place to meet. On Sundays this was the place from which the Front started and went out to make demands on the white churches in the St. Louis and St. Louis County area. Ocie Pastard is a member of the Second Presbyterian Church in the City of St. Louis. The Black Liberation Front does not have a written list of members and neither defendant Pastard nor defendant Rollins knows the identity of the members of their group, according to their sworn testimony.
On June 1, 1969, the Black Liberation Front, led by Ocie Pastard and James Rollins, with approximately twenty people, entered the Memorial Presbyterian Church in the City of St. Louis, during pastoral prayer. James Rollins stated, "I came to read the Black Manifesto that we have". Dr. Scotchmer suggested that they wait until the close of the service and the session of the church would be delighted to take up the matter with them. Rollins insisted that the Black Manifesto be read to the congregation as it would only take ten minutes. Permission to read the Black Manifesto was refused by Dr. Scotchmer. Pastard stated that the Black Liberation Front supports the Black Manifesto nationwide and in addition thereto has its own specific demands. Mr. Pastard was permitted to read the five specific demands of the local Black Liberation Front, which are generally as follows:
1. All moneys coming into the St. Louis community for urban mission shall be turned over to the black community immediately.
2. Black men have some of the jobs in the Presbyterian Churches.
3. Fifty million dollars be placed in the Gateway Bank within thirty days to begin a program in the black community.
4. The moneys will be used in the black community for the purpose of taking over institutions such as the School Board, the Poverty Program, Housing Authority, Model Cities, and slum properties.
5. "* * * we know you would accept this with brotherly love since you are all good Christians, we do not come here to make you think we are blackmailers or extortionists, we come here in the spirit of commitment and we know that you all have commitments. I don't know exactly where your commitments are but we all have commitments, this is our urban mission just like your church has an urban mission."
At the Memorial Presbyterian Church of St. Louis, Pastard stated that he had been at the Second Presbyterian Church, of which he is a member, and had made *897 the same demands there on the Sunday before.
James Rollins attended a meeting in Detroit, Michigan, on April 26, 1969, at which meeting James Forman presented a document to the assembled people addressed to the white Christian churches and the Jewish synagogues in the United States of America and all other racist institutions. This Manifesto contains the following statements:
"We live inside the U. S. which is the most barbaric country in the world and we have a chance to help bring this government down."
"Time is short and we do not have much time and it is time we stop mincing words. Caution is fine, but no oppressed people ever gained their liberation until they were ready to fight, to use whatever means necessary, including the use of force and power of the gun to bring down the colonizer."
"But while we talk of revolution which will be an armed confrontation and long years of sustained guerilla warfare inside this country, we must also talk of the type of world we want to live in. We must commit ourselves to a society where the total means of production are taken from the rich and placed into the hands of the state for the welfare of all the people."
"* * * Our fight is against racism, capitalism and imperialism and we are dedicated to building a socialist society inside the United States where the total means of production and distribution are in the hands of the State and that must be led by black people, by revolutionary blacks who are concerned about the total humanity of this world."
"Racism in the U. S. is so pervasive in the mentality of whites that only an armed, well-disciplined, black-controlled government can insure stamping out of racism in this country."
The Black Manifesto went on to demand five hundred million dollars to be spent in the establishment of a southern land bank to permit the blacks to buy land in the south, to set up four major publishing and printing industries, to set up four advanced television networks to provide an alternative to "the racist propaganda that fills the current television networks," to establish an International Black Appeal to help black Africa, to establish a black university. The Black Manifesto also stated:
"We call for the total disruption of selected church sponsored agencies operating anywhere in the U. S. and the world. Black workers, black women, black students and the black unemployed are encouraged to seize the offices, telephones, and printing apparatus of all church sponsored agencies and to hold these in trusteeship until our demands are met."
"We call upon all delegates and members of the National Black Economic Development Conference to stage sit-in demonstrations at selected black and white churches. This is not to be interpreted as a continuation of the sit-in movement of the early sixties but we know that active confrontation inside white churches is possible and will strengthen the possibility of meeting our demands. Such confrontation can take the form of reading the Black Manifesto instead of a sermon of passing it out to church members. The principle of self-defense should be applied if attacked."
"On May 4, 1969 or a date thereafter, depending upon local conditions, we call upon black people to commence the disruption of the racist churches and synogogues throughout the United States."
In effect, Mr. Forman's Black Manifesto calls for an immediate disruption of the white churches of this country, for armed revolution in this country, and guerrilla warfare with the ultimate aim of taking over the complete authority *898 of government and business to be run by blacks only.
On Sunday, June 15, 1969, Ocie Pastard, James Rollins, and other members of the Black Liberation Front came to The Central Presbyterian Church on 801 Hanley Road, Clayton, Missouri. During the singing of a hymn, Pastard, Rollins, and approximately twenty others came into the Church and were told by the ushers not to interrupt the service. But they pushed open the doors, entered the sanctuary, and went down the center aisle. Dr. Mauze stopped the singing of the hymn during the second verse, and asked them why they were there. Pastard stated that he had come to worship. He had two nickels and three pennies in his hand. He stated he wanted to place them in the cup and he did not come to spit in the cup. When requested to be seated if he desired to worship, he refused, he stated he wanted to speak to the congregation. Dr. Mauze dismissed the service and the Black Liberators left with the congregation.
On June 15, 1969, within an hour after the disruption of the church service, a church officer at the church received an anonymous telephone call threatening to burn down the church building. On June 22nd a member of the Sunday School received an anonymous telephone call stating that there were six sticks of dynamite attached to an alarm clock in the sanctuary and the church would blow up. The church, as a result of the anonymous telephone calls and the threats to burn the church building, has hired guards to guard it around the clock to prevent destruction of the property. Floodlights have also been placed outside and additional fire extinguishers have been purchased. During the disruption on June 15th, one of the members of the Black Liberation Front was heard to say, "It's beautiful gothic architecture, it's too bad it has to go." Many of the members of the congregation during the June 15, 1969, disruption (women and children) left crying, frightened and distressed.
On June 20, 1969, a temporary restraining order was issued by the Court and the plaintiffs posted bond in the sum of $1,000. A hearing was held by the Court on June 30, 1969, and the temporary restraining order was continued to September 2, 1969.
On June 22, 1969, the Black Liberation Front returned and across the street from the church building burned the Court's temporary restraining order for the benefit of the television and news media.
On Sunday, June 29, 1969, the defendants again returned and distributed the Black Manifesto to the members of the congregation as they were leaving the church.
The defendants by their conduct have given every indication that if not restrained from their acts, they will continue to disrupt the services of The Central Presbyterian Church. The plaintiffs have no adequate remedy at law and they are entitled to injunctive relief for the purpose of protecting their right to religious worship and the peaceful use of their property, as guaranteed by the Constitution of the United States. The defendants, if they are restrained, will suffer no damage for the reason they have no rights under any conceivable stretch of the imagination to conduct themselves in the manner in which they did conduct themselves on June 15, 1969.
The plaintiffs have alleged jurisdiction in this Court by virtue of Amendments I, V, IX and XIV of the United States Constitution; 42 U.S.C. §§ 1981, 1982, 1983, 1985(3), and 1988; 28 U.S.C. §§ 1331, 1343, and 1651; and 18 U.S.C. § 241. They have further alleged damages in excess of $10,000, exclusive of interest and costs.
Sections 1981-1985 of 42 U.S.C. are part of the Civil Rights Act of 1866. These sections were designed to give non-whites the rights and privileges enjoyed by whites. They were passed to *899 implement the newly passed Thirteenth and Fourteenth Amendments to the Constitution. While the Court recognizes the fact that these statutes were passed primarily to insure the rights of non-white Americans, nothing in the statutes limit their application to cases where the civil rights of non-whites are being violated. Indeed, it would be unfair to deprive white Americans of the benefit of these sections when their constitutionally-protected rights are being violated. In two recent cases dealing with related issues, the Supreme Court said:
"We think that history leaves no doubt that, if we are to give [the law] the scope that its origins dictate, we must accord it a sweep as broad as its language." Jones v. Alfred H. Mayer Co., 392 U.S. 409, 437, 88 S.Ct. 2186, 2202, 20 L.Ed.2d 1189 (1968); United States v. Price, 383 U.S. 787, 801, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966).
These statutes have been interpreted to apply to discrimination against whites as well as those of other races. Kentucky v. Powers, 139 F. 452 (Cir.Ct. E.D.Ky.1905).
Until 1968 the courts had held that the only causes of action over which the federal courts had jurisdiction were those in which plaintiffs were denied their constitutional rights by virtue of some state or local governmental action. Violations of these rights by private persons not acting under color of law did not create a cause of action under these sections. This interpretation was caused by the fact that the 1866 Act was re-enacted in 1870 after the ratification of the Fourteenth Amendment. Jones v. Alfred H. Mayer Co., 392 U.S. 409, 436, 88 S.Ct. 2186, 20 L.Ed.2d 1189. The Jones case specifically held that:
"* * * it is clear that the Act was designed to do just what its terms suggest: to prohibit all racial discrimination, whether or not under color of law, with respect to the rights enumerated therein * * *"
The Jones case deals with 42 U.S.C. § 1982, which covers discrimination in property transactions. In Dobbins v. Local 212, International Brotherhood of Electrical Workers, 292 F.Supp. 413 (S.D.Ohio 1968), suit was brought under 42 U.S.C. § 1981 with no allegation of state action. The Court held:
"At least since [Jones v. Alfred H. Mayer Co.], a strictly private right, be it in the property field as such, or the contract field as such, is within the protection of the Civil Rights Act of 1866 against interference by a private citizen or a group of citizens." Id. at 442.
In this case, plaintiffs have alleged that the defendants violated sections 1981 and 1982. These sections deal with property and contractual rights. The application of these statutes will be discussed later. Plaintiffs allege deprivation of rights protected by section 1983. The plain language of this section makes it depend upon acts done under color of law. Therefore, it is not applicable in this case.
Plaintiffs also allege a violation of 42 U.S.C. § 1985(3). This section reads in part:
"If two or more persons in any State or Territory conspire or go * * on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; * * * in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."
*900 Essentially, this section prohibits a conspiracy to deprive a person or class of persons of equal protection of the laws or equal privileges and immunities under the laws and of depriving the person or class of persons of having and exercising any right or privilege of a citizen of the United States. This is very similar to a criminal section of the Civil Rights Act of 1870, 18 U.S.C. § 241, enacted at the same time the Civil Rights Act of 1866 was re-enacted. It reads in part:
"If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States * * *."
The purpose of this section is to impose criminal sanctions upon those who would conspire to deprive a person of the exercise of rights and privileges under the Constitution and laws of the United States. The similarity in language and history of these two sections would make cases arising under one useful in interpreting the other. On the issue of what rights are protected by these statutes, the Supreme Court said:
"The language of § 241 is plain and unlimited. As we have discussed, its language embraces all of the rights and privileges secured to citizens by all of the Constitution and all of the laws of the United States. There is no indication in the language that the sweep of the section is confined to rights that are conferred by or `flow from' the Federal Government, as distinguished from those secured or confirmed or guaranteed by the Constitution." United States v. Price, 383 U.S. 787, 800, 86 S.Ct. 1152, 1160, 16 L.Ed.2d 267 (1966).
Under the Jones case, discussed supra, an allegation of state action is no longer necessary in pleading a violation of §§ 1981, 1982, and 1985. Therefore, in order for plaintiffs to state a cause of action and for this Court to have jurisdiction, they must show a conspiracy and the violation of rights and privileges secured by the Constitution and laws of the United States.
It is the opinion of the Court that plaintiffs have made sufficient allegations to state a cause of action under § 1985(3). This Court has jurisdiction over this cause of action under §§ 1985(3), 1988, and 28 U.S.C. § 1331 (a).
It is the opinion of the Court that the evidence at the hearing on the injunction showed the existence of a conspiracy to deprive the members of The Central Presbyterian Church of their right to freedom of worship as guaranteed by the Constitution of the United States. The conspiracy included James Rollins, Ocie Pastard, the Black Liberation Front, and the other named organizations. These conspirators acted in concert on the above-mentioned date to disrupt the services at The Central Presbyterian Church. The conspiracy accepts and espouses the Black Manifesto of James Forman, which has as one of its teachings demonstrations at selected churches. These demonstrations are not sit-ins like those of the 1960's, but call for the reading of the Manifesto with the aim of an active confrontation.
The defendants' demonstrations at the plaintiffs' church were of such a nature that they effectively denied the plaintiffs of their constitutionally-guaranteed right to freedom of worship. In Douglas v. City of Jeannette, 130 F.2d 652, 656 (1942 3d Cir.), the Court said:
"Freedom of worship, freedom of speech, freedom of the press, and the right of assembly are not the subject of direct constitutional grant. They are, however, constitutionally recognized and confirmed as attributes of liberty incident to all persons under the Constitution and laws of the United States regardless of their citizenship * * *."
In Jewish War Veterans of United States v. American Nazi Party, 260 F. *901 Supp. 452 (N.D.Ill.1966), the Court enjoined the defendants from participating in very similar behavior.
Plaintiffs allege that defendants have violated rights guaranteed by 42 U.S.C. § 1981. That section states:
"All persons within the jurisdiction of the United States shall have * * the full and equal benefit of all laws and proceedings for the security of persons and property * * *."
It is the opinion of the Court that plaintiffs have shown a violation of this right. Defendants have prevented the plaintiff church and its members from the right guaranteed by this section to equal benefit of laws for the security of property. This will also constitute a violation of section 1982. This section gives all citizens the same right to hold property. The defendants' actions in this case have deprived plaintiffs of the right to use their property for religious services.
Defendants are also in violation of 562.250 RSMo 1959, V.A.M.S. This statute makes disruption of religious services a misdemeanor. The purpose of this statute is to ensure religious freedom. This affirmative statement of the law of the State of Missouri establishes plaintiffs' right to peaceful religious services. It is the type of right mentioned in the above-discussed federal statutes. Because of the conspiracy between several organizations, and the great difficulty and burden involved in enforcing this statute under these circumstances, this Court will grant appropriate relief under the federal statutes.
The statutes speak of damages, however, injunctive relief is equally applicable in addition to damages. See Brewer v. Hoxie School District No. 46, 238 F.2d 91 (8th Cir. 1956).
The question of the issuance of a preliminary injunction is one of discretion with the court. Ohio Oil Co. v. Conway, 279 U.S. 813, 49 S.Ct. 256, 73 L.Ed. 972 (1929); Chicago B. & Q. R. v. Chicago Great Western R., 190 F.2d 361 (8th Cir. 1951); Missouri-Kansas-Texas R. v. Randolph, 182 F.2d 996 (8th Cir. 1950); United States v. Aluminum Co. of America, 247 F.Supp. 308 (E.D. Mo.1964), affirmed 382 U.S. 12, 86 S.Ct. 24, 15 L.Ed.2d 1 (1965). The Court must take into consideration the respective injuries to the parties and the nature of the injury. If defendants are committing illegal acts, then it is unnecessary to weigh the injuries. See Youngstown Sheet & Tube Co. v. Sawyer, D.C., 103 F.Supp. 569, affirmed 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).
These defendants have acted willfully together to harass and disturb the members of The Central Presbyterian Church in their worship service. In doing so, they have apparently violated both the criminal statutes of the State of Missouri and the United States. Their frequent attempts to intimidate the churches and their members in this area give every indication that unless restrained, they will continue to harass, disturb and oppress the plaintiffs. Their conduct is reprehensible. Such conduct, if condoned, will lead to a breakdown in this society. It should not be tolerated, and it will be enjoined.
The foregoing memorandum is adopted by the Court as its findings of fact and conclusions of law.

PRELIMINARY INJUNCTION
A memorandum dated this day is hereby incorporated in and made a part of this preliminary injunction. The Court having held a hearing on the preliminary injunction, does hereby make the following order:
It is ordered, adjudged and decreed that the defendants and all other persons acting by, through or in their behalf, individually and collectively, and all other persons who have, may now or hereafter combine, conspire or act with *902 them, or as individuals, be and they are hereby ordered to cease and desist until the 15th day of December, 1969, at 5:00 p. m., unless this order be dissolved prior thereto or extended, from:
(a) entering upon the premises of The Central Presbyterian Church, 801 South Hanley Road, Clayton, St. Louis County, Missouri;
(b) participating in, authorizing, encouraging, inducing, permitting, engaging in or carrying out the disruption, interruption or disturbance of the worship services of said Church or any meeting held on the premises of said Church;
(c) interfering or attempting to interfere directly or indirectly in any manner with the constitutional and civil rights of the plaintiffs and members of said Church to exercise freedom of religion, freedom of speech, freedom of peaceable assembly, the right to use their Church property for religious purposes and not be deprived of the use thereof, and the civil right to worship God without disruption, interruption, disturbance, intimidation, oppression, and threats of extortion, injury and physical violence;
(d) threatening, inducing or endeavoring to induce plaintiffs or any member of said Church from attending services or meetings in said Church;
(e) making any demands upon plaintiffs or members of said Church for money or for anything else;
(f) distributing or attempting to distribute to plaintiffs and the members of said Church, while on said Church premises, copies of the "demands" of the Black Liberation Front, the Black Manifesto or any other written or printed material of similar import;
(g) making any noise or commotion to disturb or disquiet any religious service or meeting at said Church;
(h) preventing or attempting to prevent ingress and egress of the plaintiffs and members of said Church to and from the Church premises;
(i) doing any and all acts to injure, harass, threaten or intimidate the plaintiffs and other members of said Church and visitors to said Church, or in any way deprive them of the freedoms, rights, privileges, immunities and equal protection of the laws and their right to hold, enjoy and use their church property as conferred upon them by Amendments I, V, IX and XIV to the Constitution of the United States and the statutes of the United States, Title 42 U.S.C. §§ 1982, 1983, 1985(3), and 1988; Title 28 U.S.C. §§ 1331, 1343, and 1651; 18 U.S.C. § 241.
(j) damaging, defacing or marring the sanctuary, building and property of the plaintiffs.
It is further ordered that said defendants, and each of them, take all steps within their power to prevent the commencement or continuation of any and all of the aforesaid acts.
It is further ordered that the bond heretofore filed by the plaintiffs in the sum of $1000.00 is continued in full force and effect until further order of the Court.
It is further ordered that December 15, 1969, at 10:00 A.M., at the United States Court House, 1114 Market Street, St. Louis, Missouri, is fixed for the time and place of final hearing in this cause.
It is further ordered that the testimony taken at the hearing on the preliminary injunction is consolidated with the final hearing.