Ruth WALD, et al., Plaintiffs, Appellants,

v.

Donald REGAN, et al., Defendants, Appellees.

No. 82–1695.

United States Court of Appeals, First Circuit.

Argued Jan. 7, 1983.

Decided May 16, 1983.

As Modified on Denial of Rehearing and Rehearing En Banc June 16, 1983.

Leonard B. Boudin, with whom Eric Lieberman, Jules Lobel, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., Michael Ratner, Sarah Wunsch, Margaret L. Ratner, Robert Boehm, Charles S. Sims, Harold A. Mayerson, Debra Evanson, Victor Goode, Deborah Jackson, New York City, Dorian Bowman, Judith Farris Bowman, and Bowman & Bowman, Cambridge, Mass., were on brief, for plaintiffs, appellants.

Ralph A. Child, Asst. U.S. Atty., with whom William F. Weld, U.S. Atty., Boston,

Mass., was on brief, for defendants, appellees.

Before BOWNES and BREYER, Circuit Judges, and PETTINE,* Senior District Judge.

BREYER, Circuit Judge.

Appellants are American citizens who want to travel to Cuba. They cannot do so because of a Treasury Department regulation that prohibits them (and many other American travelers) from paying for "transportation-related" expenses "ordinarily incident to travel to and from Cuba" and for any other expenses "ordinarily incident to travel within Cuba, including payment of living expenses and the acquisition in Cuba of goods for personal consumption there." 31 C.F.R. § 515.560 (1982). Appellants attacked the lawfulness of this regulation on constitutional and statutory grounds and asked the district court for a preliminary injunction against its enforcement. The court refused to issue the injunction and this appeal followed.

We need not reach the appellants' constitutional argument, for we believe that the challenged regulation lacks statutory authority. The Treasury Department, in promulgating the regulation, concededly did not follow the "consultative" procedures mandated by the 1977 International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701–1706—procedures aimed at focusing the attention of Congress as well as the President on the need for the restrictions of the sort at issue here. Rather, the Department relied for its authority on a "nonconsultative" predecessor statute—§ 5(b) of the Trading with the Enemy Act of 1917, (TWEA), 50 U.S.C.App. § 5(b)—the relevant part of which had been *repealed* by the time it promulgated this regulation. The Department argues that a "savings clause" in the new law, Pub.L. No. 95–223, § 101(b), 91 Stat. 1625, 1625 (1977), allows it to rely on the old law, and thereby validates its regulation. Our review of the language and legislative history of the

"savings clause," however, convinces us that this is not so. Rather, the old law does not apply and the new law's procedures were not followed. The regulation thus lacks statutory authorization, and the district court improperly denied the appellants' motion for a preliminary injunction.

I

Between 1917 when the Trading with the Enemy Act was enacted and 1977 when it was modified, TWEA provided statutory authority for the President to restrict, without congressional approval, financial transactions with foreign nations during both times of war and times of "national emergency." *See, e.g.,* Exec. Order No. 11940, 41 Fed.Reg. 43707 (1976) (export controls); Exec. Order No. 11810, 39 Fed.Reg. 35567 (1974) (same); Exec. Order No. 11796, 39 Fed.Reg. 27891 (1974) (same); Exec. Order No. 11677, 37 Fed.Reg. 15483 (1972) (same); Exec. Order No. 11387, 33 Fed.Reg. 47 (1968) (balance of payments program); Proclamation No. 2038, 48 Stat. 1689 (1933) (bank holiday); Note, *The International Emergency Economic Powers Act: A Congressional Attempt to Control Presidential Emergency Power,* 96 Harv.L.Rev. 1102, 1104, 1114 n. 61 (1983) [hereinafter cited as Harv. Note]. In 1977, however, Congress and the President modified the statute in order to narrow the President's power to impose these restrictions without first consulting with Congress. Congress did so by passing IEEPA and amending TWEA. These statutes now limit the President's power to impose economic restrictions in two ways. First, they separate his authority to regulate during war from his authority to regulate during a "national emergency." Second, they permit him to invoke the provisions of the statutes to deal with an "unusual and extraordinary threat" not involving a state of war only if he declares "a national emergency with respect to such threat," 50 U.S.C. § 1701(a), reports to Congress on the emergency every six months, 50 U.S.C. § 1703(b) & (c), and allows Congress to vote by concurrent resolution on

* Of the District of Rhode Island, sitting by designation.

the validity of his declaration of emergency, 50 U.S.C. §§ 1621(a), 1622(a).

The government concedes that, in promulgating the regulations here at issue nearly five years after the TWEA amendments and IEEPA became law, it did not follow the new procedures. The President did not declare a "national emergency," transmit appropriate reports to Congress, or grant Congress the opportunity to "veto" his actions through a resolution. The government, however, relies upon a "savings clause" in the amendment to TWEA which states:

> [T]he authorities conferred upon the President by [the old version of] section 5(b) of the Trading With the Enemy Act, which were being exercised with respect to a country on July 1, 1977, as a result of a national emergency declared by the President before such date, may continue to be exercised with respect to such country . . . .

91 Stat. at 1625. The government argues that, because TWEA "authorities . . . were being exercised" with respect to Cuba "on July 1, 1977," this language makes the old law still applicable; and the new IEEPA "consultative" requirements therefore do not apply.

In fact, on July 1, 1977—the relevant "savings clause" date—the government was *not* restricting *travel* to Cuba. Although the Treasury Department regulated travel to Cuba by means of regulations of the sort here at issue from 1963 to early 1977, on March 29, 1977, the Department repealed those travel restrictions and issued a broad, general license allowing all persons traveling to Cuba to pay for their transportation and living expenses. 42 Fed.Reg. 16621 (1977); *see also* 42 Fed.Reg. 25499 (1977) (further liberalization). The State Department, which had restricted travel to Cuba through passport regulations under 22 U.S.C. § 211a, eliminated those regulations during the same month. *See Emergency Controls on International Economic Transactions: Hearings before the Subcommittee on International Economic Policy & Trade of the House Committee on International*

*Relations*, 95th Cong., 1st Sess. 15 n. 7 (1977) [hereinafter cited as *Emergency Controls Hearings*] (statement of Prof. Andreas F. Lowenfeld, N.Y.Univ.). Hence, from March 1977 until May 1982, travel to Cuba was fully allowed. It is difficult to see, looking at the words of the statute alone, how the government can claim that the Treasury's "authorit[y]" to restrict travel-related financial transactions was "being exercised with respect to" Cuba "on July 1, 1977." Thus, it is difficult to see how the language of the "savings clause" exempts the Treasury Department from IEEPA and "saves" its power to promulgate these regulations without consulting Congress.

The government's response, and its most important argument, is that the words "authorities . . . being exercised" in the savings clause were meant to have a very broad meaning. In the government's view, as long as *some* TWEA authority was being exercised with respect to a country, say Cuba, on July 1, 1977, the clause saves the power to exercise *every* TWEA authority or at least every authority of the same broad type (*e.g.*, exchange control authority). Thus, if Treasury had imposed controls, for example, on the purchase of Cuban machinery, sugar, or cigars on July 1, 1977, the clause would "save" its power to impose controls on the payment of travel expenses to Cuba as well. Although this is not what the clause *says*, we have nonetheless investigated the new Act's legislative history and related administrative practice to see if there is support for the government's position. We have found none.

First, as a matter of common sense and common English, restricting, say, commodity purchases and restricting travel purchases would seem to be very different "exercises" of authority—different enough at least not to count as the exercise of the same authority. The direct effects of such restrictions are likely to differ. Most TWEA commercial restrictions seem designed simply to keep money or valuable commodities out of the hands of an unfriendly power. But Cuban travel restrictions may have only a small monetary impact, while effec-

tively eliminating "tourist and business travel to that country." Treasury Dept. Press Release (submitted to this court).

Moreover, administrative practice suggests that the government, historically speaking, has always considered travel restrictions different from other, more typical TWEA rules and regulations. The Justice Department and the State Department for many years after the enactment of the TWEA did not even consider TWEA an important source of "travel restriction" powers. The Justice Department consistently told Congress that the President did *not have* the power to control travel by Americans to and from the United States. *See Control of Travel from and into the United States,* H.R.Rep. No. 485, 65th Cong., 2d Sess. 2–3 (1918); *Annual Report of the Attorney General of the United States* 39–40 (1918); *Annual Report of the Attorney General of the United States* 16 (1917); *Hearings Regarding H.R. 16742: Restraints on Travel to Hostile Areas, Hearings before the House Committee on Internal Security,* 92d Cong., 2d Sess. 7539, 7561 (1972) (statement of Asst. Attorney General A. William Olson) ("there is no statute with which a person can be effectively prevented from traveling to an unauthorized area") [hereinafter cited as *Restraints on Travel Hearings*]. *See also Restraints on Travel to Countries or Areas Engaged in Armed Conflict with the United States,* H.R.Rep. No. 248, 93d Cong., 1st Sess. 1 (1973). The State Department, at least before the mid-1960's, despite the existence of TWEA's criminal sanctions, "consistently [took] the position that there was no statute which imposed or authorized" criminal penalties for violations of passport restrictions. *United States v. Laub,* 385 U.S. 475, 485, 87 S.Ct. 574, 580, 17 L.Ed.2d 526 (1967); *see Restraints on Travel Hearings, supra,* at 7572–81 (testimony of Robert Johnson, Deputy Director, Passport Office, Department of State). As far as we can tell, the Department of Justice, over a course of decades, brought only one or two TWEA-based travel prosecutions, and those were subsequently abandoned. The Treasury Department, in recent years, has considered TWEA an adequate source of travel restriction authority. However, documents submitted to this court indicate that Treasury still treats travel restrictions as different from other restrictions. When it imposes, administers, or enforces its travel restrictions, Treasury consults more closely with the State Department and defers more completely to State's expertise than in the case of ordinary commercial restrictions. *Accord United States-Cuba Trade Promotion: Hearing before the Subcommittee on International Trade & Commerce of the House Committee on International Relations,* 94th Cong., 2d Sess. 7 (1976) (testimony of Kirby Jones, Alamar Associates, Inc.); *id.* at 44–45 (testimony of Stanley L. Sommerfield, Acting Director, Office of Foreign Assets Control, Treasury Department). Moreover, at least from 1958 to 1975, Congress continually considered and reconsidered whether it *should* enact a statute imposing criminal penalties for violations of passport *travel* restrictions. Note, *Area Restrictions And The Right To Travel Abroad,* 8 U.Cal.Davis L.Rev. 401, 426 n. 130 (1975). These facts suggest that Congress, and the State, Justice, and Treasury Departments would not consider travel restrictions to be run-of-the-mill commercial restrictions, and would not consider the authority to impose travel restrictions to be similar to the authority to restrict commercial purchases.

Finally, unlike most commercial regulations, travel restrictions raise special constitutional issues, for they involve specially protected rights of citizens. *See Shapiro v. Thompson,* 394 U.S. 618, 629, 89 S.Ct. 1322, 1328, 22 L.Ed.2d 600 (1969); *United States v. Laub,* 385 U.S. at 481, 87 S.Ct. at 578; *Aptheker v. Secretary of State,* 378 U.S. 500, 517, 84 S.Ct. 1659, 1669–70, 12 L.Ed.2d 992 (1964); *Kent v. Dulles,* 357 U.S. 116, 126, 78 S.Ct. 1113, 1118, 2 L.Ed.2d 1204 (1958). This, too, supports what common sense suggests—namely that an "exercise" of the authority to restrict travel is different enough from, say, an exercise of the authority to prevent the public from buying Cuban cigars, that the two should not be lumped together for purposes of deciding

what "authorities" Treasury was "exercising" on July 1, 1977.

Second, the legislative history makes clear that Congress intended the savings clause to be narrowly interpreted to allow the President to continue in effect only those restrictions actually exercised in July 1977. It did not want the existence of one sort of TWEA restriction in 1977 to serve as a justification for imposing a new one. In fact, it did not want the President to be able to use the old Act as statutory authority for anything new. If one reads through the history of the 1977 changes, the narrow scope of what Congress intended to "save" becomes clear.

For one thing, throughout the committee hearings and the House and Senate reports, nearly every time a legislator referred to the "savings clause" and to the exercise of the TWEA "authorities," he spoke of specific, existing *"uses"* of those authorities. For example, Congressman Cavanaugh asked the Carter Administration's principal spokesman for the amendments, Mr. Bergsten of the Treasury Department:

> MR. CAVANAUGH. ... First of all, Mr. Bergsten, would it be your understanding that [the savings clause] would strictly limit and restrict the grandfathering of powers currently being exercised under 5(b) [of the TWEA] to those specific uses of the authorities granted in 5(b) being employed as of June 1, 1977.
> MR. BERGSTEN. Yes, sir.
> MR. CAVANAUGH. And it would preclude the expansion by the President of the authorities that might be included in 5(b) but are not being employed as of June 1, 1977.
> MR. BERGSTEN. That is right.

*Revision of Trading with the Enemy Act: Markup before the House Committee on International Relations,* 95th Cong., 1st Sess. 21 (1977) [hereinafter cited as *Markup*]; *see also Emergency Controls Hearings, supra,* at 147–48 (statement of R. Roger Majak, Staff Director of Subcommittee on International Economic Policy & Trade) ("There is a clear need to grandfather or deal in some special way with existing uses

of section 5(b) authorities"); *id.* at 168 (statement of Rep. Cavanaugh) ("where the powers of 5(b) are currently operative"); *id.* at 182 (statement of Rep. Cavanaugh) ("ongoing uses of 5(b)"); *id.* at 189 (statement of Rep. Bingham) ("it was the purpose of [the 'savings clause'] to grandfather in existing uses of 5(b)"); *Markup, supra,* at 9 (statement of Rep. Bingham) ("So the subcommittee settled on a limited grandfather of existing uses of international economic emergency authorities."); *Trading with the Enemy Act Reform Legislation,* H.R.Rep. No. 459, 95th Cong., 1st Sess. 11 (1977) ("exercises of emergency powers under section 5(b) which are currently in progress should be generally exempted").

Like the legislators, administration spokesmen for the bill discussed the "savings clause" in terms of existing uses of the Act's authorities. The Treasury Department also sent Mr. Leonard E. Santos to the committee hearings, who testified that the bill "grandfathered in existing uses" of § 5(b). *Emergency Controls Hearings, supra,* at 152; *see also id.* at 181–82 (testimony of Leonard E. Santos) (previous testimony "very clearly indicated that existing uses would be grandfathered"). Furthermore, Mr. Santos believed that "[o]nce this bill becomes law, section 5(b) will no longer provide authority in times of national emergency. So if the President seeks to take new national emergency action, he would have to take it under this new bill [the IEEPA]." *Id.* at 211. The Treasury needed a "savings clause," he explained, because it would find it awkward to issue a new declaration of emergency to justify "existing uses" of § 5(b) authority. *Id.* at 182; *see also id.* (testimony of Leonard E. Santos) (the testimony "of both Treasury and the State Department [which did not mention travel to Cuba] listed specifically those uses of 5(b) that we would like grandfathered"); *id.* at 113 (testimony of Asst. Treasury Secretary C. Fred Bergsten). The State Department's spokesmen gave testimony that was broadly consistent with that of Mr. Bergsten and Mr. Santos. Assistant State Department Secretary Julius L. Katz,

for example, urged "that the section 5(b) powers and authorities ... now in effect" be saved. *Id.* at 101. Although very specific exercises of existing authority were discussed, *see, e.g., id.* at 108, the Treasury and the State Departments mentioned scarcely a word about the need to preserve through the "savings clause" the right to impose Cuban travel restrictions. *But cf. id.* at 215 (testimony of Leonard E. Santos).

For another thing, when Congressman Bingham, a principal legislative sponsor of the TWEA amendments, discovered draft language that might have allowed a broader reading of the "savings clause," thereby preserving TWEA powers that were *not* then exercised, he deliberately struck the language from the bill. The subcommittee staff's initial draft of the "savings clause" not only preserved "any authority conferred upon the President by section 5(b) of the Trading with the Enemy Act, which is being exercised with respect to a set of circumstances on the date of enactment of this Act," but also stated that "any other authority conferred upon the President by that section may be exercised to deal with the same set of circumstances." *Amendments to the Trading with the Enemy Act: Subcommittee Working Draft of June 8, 1977,* 95th Cong., 1st Sess. § 101(b). Subcommittee Staff Director Majak explained that under the second provision, "with respect to any uses of 5(b) authorities for any presently existing situation, not only could the President use those particular authorities that he is now using, but any others which are conferred by section 5(b).... I think it boils down to a question of whether we are grandfathering a particular situation, and all the powers that may be necessary to deal with the situation, or whether we are grandfathering the particular authorities themselves and their usage." *Emergency Controls Hearings, supra,* at 167. Congressman Bingham objected to this draft, making clear that he did not want to grandfather the former—the "situation." Rather, he wanted to grandfather only the latter, namely the particular existing uses of those powers. He said, "I don't know why it should be necessary to give [the President] authority to expand what has already been done," *id.* He therefore opposed the second clause. And, the subcommittee eventually dropped it from the bill.

Finally, an examination of the purpose behind the "savings clause" supports the appellants, not the government. Congress provided the "savings clause" for existing trade embargoes to mitigate the adverse effect that automatic repeal would have had on the President's negotiating position with respect to other countries. To have required the President to announce publicly a *new declaration* of emergency in order to continue an *existing embargo* would have required him to undertake a political act with international political impact. The result, as described by Prof. Lowenfeld before the subcommittee, might have been an "inappropriate interference in negotiations being carried out by the Executive Branch...." *Emergency Controls Hearings, supra,* at 19. It would be "very awkward," Professor Lowenfeld explained, for Congress suddenly to call an "end" to the Cuban embargo "without any deal or understanding." *Id.; see also id.* (testimony of Prof. Lowenfeld) ("perhaps ... [the Cuban embargo] should not be terminated without a quid pro quo"). Assistant Treasury Secretary Bergsten repeated this theme, stating that "a unilateral termination of the embargoes" that would require the President to reassert a national emergency "would severely undermine the U.S. negotiating position with those countries, and our worldwide posture." *Id.* at 103. Cuban travel restrictions did not involve the problem at which this clause was aimed, however, for the very reason that they were not in effect in 1977. Thus, their reimposition in 1982 automatically required a public declaration with political impact *anyway.* For example, when they were reimposed Assistant Treasury Secretary John M. Walker declared the restrictions "an important part of this Government's policy of tightening the current trade and financial embargo against Cuba." "Cuba will not be allowed," he warned, "to earn hard curren-

cy from American tourists at a time when Cuba is actively sponsoring armed violence against our friends and allies. . . ." Crossette, *U.S., Linking Cuba to 'Violence,' Blocks Tourist and Business Trips,* N.Y. Times, Apr. 20, 1982, at A1, col. 4. Thus, the reason for the "savings clause"—the need to avoid this type of public act in order to continue *ongoing* restrictions—simply bears no relation to this case. In light of the consequent lack of justification for a "savings clause" to preserve powers not then being exercised, it is not surprising that a reading of the history of IEEPA and the TWEA amendments suggests, even more strongly than a few quotations can indicate, that Congress intended IEEPA, not the old TWEA, to apply to particular restrictions, such as Cuban travel, not in effect in July 1977.

## II

We conclude that, given ordinary principles of statutory construction, *see, e.g., Drysdale v. Spirito,* 689 F.2d 252, 256–57 (1st Cir.1982); *Constance v. Secretary of HHS,* 672 F.2d 990, 995–97 (1st Cir.1982), the "savings clause" does not apply. We are reinforced in our conclusion by several factors that suggest that even if the statute (and its history) were more ambiguous, we should nonetheless interpret it to favor appellants.

First of all, this case involves travel which the Supreme Court has held to be "a constitutional right closely related to" those activities that the Bill of Rights protects from infringement by Congress. *Aptheker v. Secretary of State,* 378 U.S. at 517, 84 S.Ct. at 1669–70; *see Shapiro v. Thompson,* 394 U.S. at 629, 89 S.Ct. at 1328; *United States v. Laub,* 385 U.S. at 481, 87 S.Ct. at 578; *Kent v. Dulles,* 357 U.S. at 126, 78 S.Ct. at 1118; Note, *Constitutional Protection of Foreign Travel,* 81 Colum.L.Rev. 902, 906 (1981). Although courts often defer to the Executive in the area of foreign affairs, *see, e.g., Dames & Moore v. Regan,* 453 U.S. 654, 672–73, 678, 101 S.Ct. 2972, 2983–84, 2986, 69 L.Ed.2d 918 (1981); *Zemel v. Rusk,* 381 U.S. 1, 17, 85 S.Ct. 1271, 1281,

14 L.Ed.2d 179 (1965); *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 314–22, 57 S.Ct. 216, 218–22, 81 L.Ed. 255 (1936), the Supreme Court has explicitly instructed us to "construe narrowly all delegated powers that curtail or dilute" the right to travel. *Kent v. Dulles,* 357 U.S. at 129, 78 S.Ct. at 1120; *see Aptheker v. Secretary of State,* 378 U.S. at 508, 84 S.Ct. at 1664–65. That principle of narrow interpretation applies here.

Moreover, the savings clause, as we interpret it, does not prevent the other two branches of government from taking whatever steps they believe necessary to conduct our affairs with Cuba. It simply requires the President in conducting those affairs to consult with the legislative branch according to the terms of IEEPA. The TWEA amendments and IEEPA move travel restrictions of this sort from the first of the categories mentioned by Justice Jackson in *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635–37, 72 S.Ct. 863, 870–71, 96 L.Ed. 1153 (1952) (Jackson, J., concurring) (areas in which Congress has delegated its authority to the President) to the third category, *id.* at 637–38, 72 S.Ct. at 871 (areas in which Congress has taken measures inconsistent with the President's claim to power). In situations involving the third category, "[c]ourts can sustain exclusive presidential control . . . only by disabling the Congress from acting upon the subject." *Id.* In effect, we do not *limit* the exercise of foreign affairs powers by the other branches, so much as we *allocate* the powers of decision-making *between* the other two branches according to the guidelines Congress set forth. We do not arrogate to ourselves the power to make foreign policy, so much as we preserve the constitutional "equilibrium," *id.* at 638, 72 S.Ct. at 871, between the President and Congress and insist that the Executive Branch follow the laws that the Legislative Branch enacts.

Finally, the Supreme Court has also suggested that we look to other contemporaneously enacted statutes for the light they cast on the historical context of the statute at issue. *See Dames & Moore v. Regan,* 453

U.S. at 678, 101 S.Ct. at 2986. Were we to do so here, we should find additional grounds for interpreting the TWEA savings clause restrictively. The 1977 legislative changes at issue were only part of a series of laws aimed at imposing Congressional limits upon the President's restrictive powers. *See, e.g.,* War Powers Resolution, Pub.L. No. 93–148, 87 Stat. 555 (1973) (codified as amended at 50 U.S.C. §§ 1541–1548) (restrictions on Presidential power to employ U.S. forces abroad); National Emergencies Act, Pub.L. No. 94–412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601–1651) (procedures for Presidential declarations and continuations of national emergencies). In 1978 Congress amended the Passport Act, 22 U.S.C. § 211a, to prohibit the executive branch from imposing peacetime passport travel restrictions without the authorization of Congress except for health and safety considerations. Pub.L. No. 95–426, § 124, 92 Stat. 963, 971 (1978); *see Haig v. Agee,* 453 U.S. 280, 290 n. 18, 101 S.Ct. 2766, 2773 n. 18, 69 L.Ed.2d 640 (1981). At the time, the Senate Foreign Relations Committee stated in its Report that it believed "that the freedom-of-travel principle is sufficiently important that it should be a matter of law not dependent upon a particular Administration's policy." *Foreign Relations Authorizations Act, Fiscal Year 1979: Report of the Senate Committee on Foreign Relations,* S.Rep. No. 95–842, 95th Cong., 2d Sess. 14 (1978). To interpret the "savings clause" as the government suggests, would make the Passport Act amendment meaningless in terms of Cuba, for the Executive Branch could unilaterally impose Cuban travel restrictions by imposing currency restrictions as it did here. A more narrow interpretation of the TWEA savings clause—by making applicable IEEPA's consultative procedures—helps to harmonize the two statutes. Thus, these additional considerations and interpretive principles help support our conclusion. As Part I indicates, they are not in fact necessary to reach it.

### III

To grant a preliminary injunction, a court must consider whether plaintiffs will suffer irreparable injury if the injunction is denied, whether such injury outweighs any harm that the injunctive relief would cause the defendants, whether plaintiffs have a likelihood of succeeding on the merits, and whether the public interest would not be harmed by a preliminary injunction. *Agency Rent-A-Car, Inc. v. Connolly,* 686 F.2d 1029, 1034 (1st Cir.1982); *Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981). The district court here denied the plaintiffs' motion on the grounds that they had not demonstrated a sufficient likelihood of succeeding on the merits. We disagree. For the reasons stated above in part I, we believe that the "savings clause" of the amendment to TWEA does not authorize the executive to issue the regulation at bar. For the reasons stated in part II, we believe that even if the legislative history of the "savings clause" were not so clear, we would still have to find it inadequate support for the government's attempt to restrict travel to Cuba without consulting Congress. Thus, we hold the challenged restrictions on travel illegal. And, in light of the definitiveness with which the law can be stated, plaintiffs need not make a separate showing of irreparable harm, *see, e.g., United States v. Hayes International Corp.,* 415 F.2d 1038, 1045 (5th Cir.1969); 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2948, at 461 (1973), or of the balance of injuries, *see, e.g., Central Presbyterian Church v. Black Liberation Front,* 303 F.Supp. 894, 901 (E.D.Mo.1969); *Youngstown Sheet & Tube Co. v. Sawyer,* 103 F.Supp. 569, 576 (D.C.D.C.), *aff'd,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), and the public has no interest in the enforcement of an illegal regulation. Accordingly, a preliminary injunction should issue against the enforcement of the April 20, 1982 amendments to 31 C.F.R. § 515.560, 47 Fed.Reg. 17030.

*The order of the district court is vacated, and the case is remanded with instructions to issue a preliminary injunction.*

## MEMORANDUM AND ORDER

The government moves for rehearing and it seeks a stay of this court's mandate. We deny these motions. Because the government states that the decision has significant implications for foreign policy, detailed discussion of the government's requests and reasons is appropriate.

### I

#### The Petition for Rehearing

We do not believe that the arguments the government advances provide an adequate basis for a rehearing. First, contrary to the government's current suggestion, the government had adequate opportunity to brief and to argue the question upon which the court's decision turned, namely, whether travel is sufficiently like "say, commodity purchases ... to count as the exercise of the same authority" for savings clause purposes. (at 796.) The government's initial brief argued at length that the savings clause should be interpreted to embargo an existing state of emergency rather than an existing set of regulations on a given subject. Oral argument refined the question further; and, the government filed a post-argument brief in response to the court's question:

> What reason is there to believe that administrators have treated "travel" as a distinct and separate category of economic transaction under the statutes?

The government stated in its post-argument brief that it would seek permission to file a further brief if there was more it wished to say. It did not do so. It seems to us that the government had a fair opportunity to address the issues; that the issues were adequately focused; and that the issues were adequately briefed by both sides.

Second, the government argues that it *was* exercising its authority to restrict travel to Cuba on July 1, 1977, because of the *form* of its regulations—because its regulations consisted of a general rule forbidding *all* transactions with Cuba, *see* 31 C.F.R. § 515.201, followed by a "General License" allowing "[a]ll transactions ordinarily inci-

dent to travel to and from [and in] Cuba," *see* 42 Fed.Reg. 16621 (Mar. 29, 1977), *codified at* 31 C.F.R. § 515.560(a). The court treated this argument as invalid because it assumed that *substance* (*i.e.,* was travel in fact being regulated?) rather than *form,* controlled. The government devoted little attention in its initial brief to this argument, and nothing it says there or in its new brief convinces us that the court's assumption was faulty.

Third, the government now argues that *in fact* it was regulating Cuban travel on July 1, 1977, because travelers could bring back only $100 worth of goods for personal use, because it allowed only non-scheduled flights, and because domestic credit card issuers were forbidden to contract with Cuban enterprises. These restrictions, in our view, merely represent an effort to reconcile rules that allow travel with rules that forbid ordinary commercial transactions. Regardless, their impact on "travel" is too minor to change the result.

Fourth, the government points to two statements in the legislative history of the savings clause which it believes support its position. *See Emergency Controls on International Economic Transactions: Hearings Before the Subcommittee on International Economic Policy & Trade of the House Committee on International Relations,* 95th Cong., 1st Sess. 211 (1977) (Statement of Treasury Department spokesman: "If the President claims that he must do something new with respect to Cuba, ... that, of course, is automatic."); *id.* at 215 (Statement of Treasury Department spokesman to the effect that currently there "are essentially transaction control regulations to the extent that the transaction involves a transfer of assets, it would involve travel to those countries [*i.e.,* Cuba and Vietnam] and the exchange of goods.") In fact, the extent to which these statements help the government is unclear. When the spokesman used the word "automatic" did he mean that new regulations would automatically take effect without the IEEPA procedures, or did he mean (in context) that it was obvious the new procedures must be

used? When he referred to restrictions in effect on travel to Cuba (a few weeks after they had been removed), was he focusing on the issue considered here, or was he simply comparing a (later changed) draft of the grandfather clause that *plainly accepted* the government's view of the savings clause with another (here irrelevant) grandfather clause designed to save certain asset control powers? Regardless, the overall impression that the legislative history gives remains the same. And, the two quotations do not warrant significant change in the court's conclusions. We shall, however, modify the opinion to make clear that the government believes these quotations support its position.

Fifth, the government argues that the court's decision will affect foreign policy adversely by requiring the Executive Branch to follow IEEPA procedures whenever it wishes to tighten present restrictions. We point out that the court's opinion concerns travel, which it considered a separate category of restriction; it does not concern minor modifications of existing rules. The question of whether it is desirable for the President to declare an emergency and to consult with Congress when imposing restrictions on (previously unrestricted) travel would seem to be a matter for the Executive and Legislative branches, not this court.

## II

### The Petition for a Stay of Mandate

The court issued its decision in this case on May 16, 1983. Under Fed.R.App.P. 41(a) the court's mandate would have issued at the close of business on June 6, 1983, had the government not filed a rehearing petition. Since it did so, the mandate, in the ordinary course of events, would issue seven days after entry of an order denying the petition. The government seeks, in this event, an additional stay of our mandate for thirty days while it decides whether or not to seek certiorari.

Although the government seems to ask for a short period of additional time, more is at stake. Under Fed.R.App.P. 41(b), if we grant this additional stay and if the government then files a petition for certiorari, "the stay shall continue until final disposition by the Supreme Court." Fed.R. App.P. 41(b). Thus, what is at issue is whether, during the several months probably necessary for the disposition of the government's certiorari petition, the appellants will be free to travel to Cuba.

In deciding whether or not to grant this application, we have considered several factors. Ordinarily, where a party has won on appeal after losing in the district court, it is appropriate to put the appellate court decision into effect pending the Supreme Court's ruling. The winning *appellate* court party has the better claim to the law's support. It is therefore the practice in this circuit and in the Supreme Court, *cf.* Sup. Ct.R. 44.4, not to grant stays except in unusual cases. On the other hand, in this instance the losing party points to considerations of foreign policy allegedly threatened by the court's decision. That factor weighs in favor of the stay. Nonetheless, appellants are asserting the right to travel, "a constitutional liberty closely related to" those activities that the Bill of Rights protects from infringement by Congress. *Aptheker v. Secretary of State,* 378 U.S. 500, 517, 84 S.Ct. 1659, 1669, 12 L.Ed.2d 992 (1964). This factor weighs against the stay.

Finally, we have made a judgment about the likelihood of the Supreme Court reaching a different result. We can understand how others could reasonably conclude that the legislative history is ambiguous and should be read differently. The Supreme Court, however, has instructed us to "construe narrowly all delegated powers that curtail or dilute" the right to travel. *Kent v. Dulles,* 357 U.S. 116, 129, 78 S.Ct. 1113, 1119, 2 L.Ed.2d 1204 (1958). And, we doubt that a reasonable reader could conclude that the relevant legislative history *clearly* supports the government. Thus, we think it unlikely that the Supreme Court will reach a different decision.

After considering the various harms likely to be caused by a stay, the rights of the

parties, the practical implications of the decision, and the likelihood of the government's success in further proceedings, we conclude that the government's request for an additional stay should be denied.

### ORDER

The opinion shall be modified as follows:

[Editor's note: Correction was made to the original opinion in accordance with the Court's instructions.]

The application for rehearing and the application for stay of mandate are denied.