KORMAN, District Judge,
dissenting:
I assume familiarity with the background of this case in which the defendants have moved to stay the mandate for ninety days so that they may file a petition for a writ of certiorari. While the plaintiffs have declined to consent to the motion, they have made no showing of prejudice that would result from staying the mandate. Nevertheless, the majority has voted to deny the application. I write to explain my reasons for dissenting from that denial.
(1)
Under Fed. R. App. P. 41(d)(2)(A), a motion to stay the mandate pending a petition for a writ of certiorari “must show that the certiorari petition would present a substantial question and that there is good cause for a stay.” This case involves substantial issues regarding the application, of the ATCA of the kind that arise with increasing frequency. Indeed, this was the reason the Supreme Court gave for granting certiorari in Sosa v. Alvarez-Machain, 542 U.S. 692, 699, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). More significantly, this case “implicates considerations of foreign policy ... threatened by the [panel’s] decision” that “weigh[ ] in favor of a stay.” See Wald v. Regan, 708 F.2d 794, 803 (1st Cir.1983) (Breyer, J.).[1] Indeed, in *154 Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), the Supreme Court explained that it had “granted certiorari because the issues involved bear importantly on the conduct of the country’s foreign relations and more particularly on the proper role of the Judicial Branch.... ” Id. at 407, 84 S.Ct. 923.
This accurately describes the threshold issue in this case as to which the real party in interest is the Republic of South Africa. Specifically, invoking the doctrine of international comity, it asked the district court to dismiss the case, and it asked us to apply the same doctrine to affirm the dismissal by the district court judge. The Executive Branch joined in that application because of the foreign policy implications that the rejection of South Africa’s plea would have on our relations with that country as well as those of “[vjarious foreign governments, including the United Kingdom and Canada, which have also approached us via diplomatic channels to express their profound concern that their banks, corporations and other entities have been named as defendants”, A. 01090-9, and their “strong belief that the issues raised in the litigation are most appropriately handled through South Africa’s domestic process.” Id.
Under these circumstances, the defendants are acting as surrogates for the Republic of South Africa in petitioning for certiorari and seeking a stay of the mandate. Indeed, after the majority reversed the judgment dismissing the complaint, the Republic of South Africa, speaking through its Minister of Justice, issued a statement reiterating its “view that the case is directly related to the sovereignty of the South African state and should be resolved through South Africa’s own democratic process.” Ministry of Justice and Constitutional Development Republic of South Africa, Media Statement: Apartheid Lawsuit — US court of appeal decision (Oct. 19, 2007).
Thus, the issue that the Supreme Court will be asked to consider is the plea of the Republic of South Africa that the Judicial Branch of the United States not meddle in its affairs by entertaining complaints in which the United States does not have any interest — a position supported by a number of scholars, including some of the most committed human rights advocates. See, e.g., Beth Stephens, Sosa v. Alvarez-Machain, “The Door Is Still Ajar ” for Human Rights Litigation in U.S. Courts, 70 Brook. L. Rev. 533, 562 (2005). Because “the issues involved bear importantly on the conduct of the country’s foreign relations and more particularly on the role of the Judicial Branch”, Sabbatino, 376 U.S. at 407, 84 S.Ct. 923, “the certiorari petition would present a substantial federal question.” Fed. R. App. P. 41(d)(2)(A).
More than that, this is a case in which the Supreme Court has already indicated a special interest. In what can only be described as an extraordinary discussion of this case, the Supreme Court provided guidance with respect to how South Africa’s plea should be considered in its Sosa opinion. Thus, after formulating the doctrine of case-specific deference out of concern that “many attempts by federal courts to craft remedies for the violation of new norms of international law would raise risks of adverse foreign policy consequences,” Sosa, 542 U.S. at 727-28, 124 S.Ct. 2739, the Supreme Court turned to the present case:
For example, there are now pending in Federal District Court several class actions seeking damages from various corporations alleged to have participated in, or abetted, the regime of apartheid that formerly controlled South Africa. See In re South African Apartheid Litigar *155 tion, 238 F.Supp.2d 1379 (JPML 2002) (granting a motion to transfer the cases to the Southern District of New York). The Government of South Africa has said that these cases interfere with the policy embodied by its Truth and Reconciliation Commission, which “deliberately avoided a ‘victors’ justice’ approach to the crimes of apartheid and chose instead one based on confession and absolution, informed by the principles of reconciliation, reconstruction, reparation and goodwill.” Declaration of Penuell Mpapa Maduna, Minister of Justice and Constitutional Development, Republic of South Africa, reprinted in App. to Brief for Government of Commonwealth of Australia et al. as Amici Curiae 7a, ¶ 3.2.1 (emphasis deleted). The United States has agreed, See Letter of William H. Taft IV, Legal Adviser, Dept, of State, to Shannen W. Coffin, Deputy Asst. Atty. Gen., Oct. 27, 2003, reprinted in id., at 2a. In such cases, there is a strong argument that .federal courts should give serious weight to the Executive Branch’s view of the case’s impact on foreign policy.
Id. at 733 n.21, 124 S.Ct. 2739 (emphasis added) (citation omitted). The majority here brushed off this advice, saying that it “views summary dismissal at the behest of a footnote premature.” Khulumani v. Barclay Nat’l Bank Ltd., 504 F.3d 254 (2d Cir.2007). Nevertheless, the discussion of this case in Sosa provides additional support for the argument that certiorari may be granted. Moreover, the absence of any compelling reason for rejecting the plea of the Republic of South Africa, suggests that if certiorari is granted, the judgment may be reversed. Indeed, a tally of the seventy-five cases, in which the Supreme Court published Slip Opinions, Per Curiams, and Original Case Decrees in the 2006-2007 term, indicated that over two-thirds, fifty-two precisely, were either reversed- or vacated.
This case not only presents a “substantial question”, but there is also “good cause” to stay the mandate. See Fed. R. App. P. 41(d)(2)(A). The continued prosecution of this matter constitutes a continuing insult to the Republic of South Africa and a continuing irritant to our relationship with that post-apartheid government. More significantly, as previously noted, on this issue, the Republic of South Africa is the aggrieved party and the real party in interest. The remand will only cause it more harm by enmeshing it in the litigation. Indeed, one footnote in the per cu-riam opinion specifically refers to the failure of the district court judge to decide the plaintiffs’-motion to strike the Statement of Judgment filed on behalf of the Republic of South Africa by its Minister of Justice, Khulumani v. Barclay Nat’l Bank Ltd., 504 F.3d at 259 n.3. This otherwise pointless observation suggests that the Republic of South Africa could be forced into an evidentiary hearing to defend the validity of its objection. Indeed, in its opinion denying the motion to stay the mandate, the majority observes that the district court has not
had the opportunity to address the competing views on this issue. Compare Brief for the United States of America as Amicus Curiae, Brief for South Africa as Amicus Curiae, and Media Statement of Minister for Justice and Constitutional Development Brigitte Mabandla (Oct. 19, 2007), with Brief for South African Organizations, Unions and Political Parties and Brief for [the former] Commissioners and Committee Members of South Africa’s Truth and Reconciliation Commission as Amici Curiae (including the views of Archbishop Desmond Tutu).
Majority Op. ante at 153 n. 2. The latter amicus brief argues that, contrary to the *156 position of the South African government, the current litigation “does not conflict in any manner with the policies of the South African government, or the goals of the South African people, as embodied in the TRC.” TRC Br. at 2.[2] But it is only for the South African government, through its elected representatives, to say whether this litigation conflicts with its policies, just as it earlier decided for the same reasons to reject the Truth and Reconciliation Commission’s recommendation that a once-off wealth tax be imposed on all corporations. Surely this is not a dispute for a United States district judge to resolve. See Bi v. Union Carbide Chems. & Plastics Co., 984 F.2d 582, 586 (2d Cir.1993) (Newman, /.). Yet, the majority contemplates a remand that would subject a foreign democratic nation to the indignity of having to defend policy judgments that have been entrusted to it by a free people against an attack by private citizens and organizations who have lost the political battle at home. This dispute is not the business of the Judicial Branch of the United States. A stay is warranted to allow the Supreme Court to determine whether to permit such a proceeding to go forward.
(2)
The majority justifies the denial of the stay of the mandate on the grounds that one of the issues the defendants identified in their motion — the issue of case-specific deference — has not “been sufficiently developed to be fit for review by the Supreme Court.” Majority Op. ante at 152. This defect is said to result from the fact that “the district court explicitly refrained from addressing this issue” and the majority’s consequent failure to “address the applicability of case-specific deference ----” Id.
Passing over the accuracy of the majority’s description of the district court’s opinion, the defect asserted by the majority is not an impediment sufficient to deny a stay of the mandate for a number of reasons. The “traditional rule,” as the Supreme Court has observed, “precludes a grant of certiorari only when the question presented was not pressed or passed upon below.” United States v. Williams, 504 U.S. 36, 41, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) (Scalia, J.) (internal quotation marks omitted). This “rule operates (as it is phrased) in the disjunctive....” Id. Thus it permits review where an issue was passed upon below, even though not argued, and where the issue was argued and not passed upon. Indeed, the Supreme Court is authorized to grant certiorari before judgment by the Court of Appeals. 28 U.S.C. § 1254(1); see, e.g., Mistretta v. United States, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). While such discretionary review is unusual, the Supreme Court has considered issues not resolved by the Court of Appeals that “raise only [an] issue[ ] of law not calling for examination [and] appraisal of evidence....” Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 214, 71 S.Ct. 259, 95 L.Ed. 219 (1951). Indeed, it has exercised its discretion to consider an issue that had not been raised below and that it raised sua sponte. See Sibbach v. Wilson & Co., 312 U.S. 1, 16, 61 S.Ct. 422, 85 L.Ed. 479 (1941). Whether the Supreme Court will deny certiorari and allow this case to go forward, simply because two of the three members of the panel declined to reach the issue, will ultimately depend on its assessment of the importance of the issue and *157 the consequences of permitting the kind of proceeding the majority envisions to go forward. See Youakim v. Miller, 425 U.S. 231, 234, 96 S.Ct. 1399, 47 L.Ed.2d 701 (1976).
In sum, the unjustified refusal of the majority to address the issue of case-specific deference is not a basis to deny the motion to stay the mandate. On the contrary, this case raises an additional issue, namely, whether it was proper for a majority of the panel to decline to reach the issue. In my separate opinion, I addressed the significant considerations of policy that warrant reaching the issue of case-specific jurisdiction, even if it had not been decided by the district court. More significantly, I demonstrated that the majority was compelled to reach the issue because it involved the subject-matter jurisdiction of the district court. This argument turned on the jurisdiction-conferring language of the ATCA, the manner in which it had been construed in Sosa, and our own pre-Sosa precedent, beginning with Filartiga v. Pena-Irala, 630 F.2d 876, 887-88 (2d Cir.1980). See Khulumani v. Barclay Nat’l Bank Ltd., 504 F.3d at 307-10. The per curiam opinion offered no response to this argument, and its refusal to reach the issue at the threshold is itself worthy of certiorari.
(3)
I have passed over the issue of whether the per curiam opinion accurately described the manner in which the district judge addressed the issue of case-specific jurisdiction. The majority repeats the assertion made in the per curiam opinion that “the district court explicitly refrained from addressing the defendants’ arguments that the ATCA claim presented a non-justiciable-political question,” ante at 152 (quoting Khulumani v. Barclay Nat’l Bank Ltd., 504 F.3d at 262 (per curiam)). This assertion, which implies that the district court judge was referring to the issue of case-specific jurisdiction, is predicated on footnote 4 of the district court opinion. See In re South Africa Apartheid Litig., 346 F.Supp.2d at 543 n.4 (parenthetical omitted). The footnote reads as follows:
Defendants also argue that there is no case or controversy for this Court to hear under Article III of the Constitution ... because the matter is a non-justiciable political question. See Memorandum of Law in Support of Defendants’ Joint Motion to Dismiss at 3-4. Given the Court’s finding that defendants are entitled to relief on other grounds, the Court need not address these remaining grounds for defendants’ motion.
Id. (emphasis added). The italicized reference to the source of the defendants’ argument is deleted from the quotation that appears in the majority opinion here and in the per curiam opinion. Khulumani v. Barclay Nat’l Bank Ltd., 504 F.3d at 262. This omission is not without purpose.
The Memorandum of Law in Support of the Defendants’ Joint Motion to Dismiss (“Joint Motion”), which Judge Sprizzo expressly referenced in the part of his opinion declining to address the issue, argued (in relevant part) that the “adjudication of plaintiffs’ claim would require a court to pass on the merits of political questions that were resolved by the executive and legislative branches of the United States government in favor of commerce with South Africa.” Joint Motion at 3. It did not address the issue of case-specific deference. Indeed, the defendants’ motion predated the State Department’s Statement of Interest and was filed a year before Sosa was decided.
When the defendants subsequently raised the argument, Judge Sprizzo did not “explicitly refrain” from addressing it. *158 On the contrary, he spoke to it directly. Specifically, he observed that, “even though the Sosa decision did not deliver the definitive guidance ... that some had come to expect, nevertheless it does dispose of the issues raised by these motions.” In re South African Apartheid Litig., 346 F.Supp.2d at 547. Judge Spriz-zo then reviewed each of the considerations that he understood Sosa required “courts to consider in determining whether conduct should be found to be encompassed by the ATCA.” Id. One such consideration was that “courts must consider the foreign relations consequences of finding that conduct is encompassed by the ATCA, since entertaining such suits can impinge on the discretion of the legislative and executive branches of this country as well as those of other nations.” Id. at 548 (citing Sosa, 542 U.S. at 733 n. 21, 124 S.Ct. 2739). Speaking to the issue of recognizing a cause of action for aiding- and-abetting a violation of a norm of customary international law, he alluded generally to “the collateral consequences and possible foreign relations repercussions that would result from allowing courts in this country to hear civil suits for the aiding-and-abetting of violations of international norms around the globe.” Id. at 551. “To do so,” he held, “would not be consistent with the ‘restrained conception’ of new international law violations that the Supreme Court has mandated for the lower federal courts.” Id. Of particular relevance is the following detailed discussion of this consideration, as applied to the specific facts of this case:
[A]s Sosa points out, this Court must be aware of the collateral consequences that would result from finding a new international law violation that would support ATCA jurisdiction. In this case, those consequences are not only far-reaching but would raise the prospect of serious impediments to the flow of international commerce. Indeed, the South African government has indicated that it does not support this litigation and that it believes that allowing this action to proceed would preempt the ability of the government to handle domestic matters and would discourage needed investment in the South African economy. See Declaration of Minister Penuell Mpapa Maduna, dated July 11, 2003 at ¶¶ 10, 12. Similarly, the United States government has expressed its belief that the adjudication of this suit would cause tension between the United States and South Africa and would serve to hamper the policy of encouraging positive change in developing countries via economic investment. See Statement of Interest of the United States, dated October 30, 2003. As the Sosa Court made clear, these opinions as to the foreign relations consequences of this action certainly deserve great weight. See Sosa, 124 S.Ct. at 2766 n. 21 (mentioning this case specifically and stating that “in such cases, there is a strong argument that federal courts should give serious weight to the Executive Branch’s view of the case’s impact on foreign policy”).
Id. at 553-54. The advice provided by Sosa on the issue of case-specific deference was clearly one of the considerations underlying Judge Sprizzo’s opinion.
(4)
While I have focused on the case-specific deference/international comity issue because it alone justifies a stay of the mandate, that issue is not the only one defendants intend to raise in their certio-rari petition. They also intend to argue that “[t]he court’s recognition of claims for aiding and abetting violations of international law is inconsistent with Sosa.” Mot. to Stay the Mandate at 4. This claim has particular force because it necessarily *159 includes the following issues addressed extensively in my separate opinion: (1) whether customary international law provides a basis for imposing liability on corporate entities[3]; (2) whether the standard for imposing such liability (that Judge Katzmann and I agree upon), which did not emerge until after the defendants engaged in the conduct alleged in the complaints, may be applied retroactively; and, (3) whether allowing causes of action, alleging a violation of the customary international law norm of genocide, which Congress expressly indicated its intent to proscribe, is an abuse of our discretion, see Khulumani v. Barclay Nat’l Bank Ltd., 504 F.3d at 320-21.[4] These are substantial issues warranting a stay of the mandate.

Conclusion

In sum, an arbitrary refusal by two members of a panel of the Court of Appeals to avoid reaching an issue does not insulate the issue from Supreme Court review, nor does it insulate from review the propriety of its refusal to address the issue. I have learned from Judge Breyer’s experience in Wald v. Regan, 708 F.2d 794, 803 (1st Cir.1983), rev’d, 468 U.S. 222, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984), the dangers of predicting the outcome of proceedings in the Supreme Court. I suggest, however, that this case is worthy of certio-rari and that there are no compelling reasons for denying the motion to stay the mandate. On the contrary, the prejudice to the Republic of South Africa and to our relationship with that post-apartheid democracy counsel against permitting the proceedings the majority envisions on remand from going forward.
While I vote to grant the motion to stay the mandate, I add these words of concern regarding the apparent intention of the defendants to take the full ninety days they have to file a petition for a writ of certiorari. The filing of a petition in early to mid-December would make it possible for the Supreme Court to decide the case in its current term, should it grant the petition. Delaying the filing of the petition until mid-January makes that impossible and could delay the disposition until 2009. The defendants are represented by some of the nation’s leading law firms, including a firm with one of the most highly-regarded Supreme Court practices in the nation. There is no reason why they should not be able to file the petition promptly. The prejudice of the delay is not to the plaintiffs, but to the Republic of South Africa.
Accordingly, for the foregoing reasons, I vote to grant the motion to stay the mandate. Although the majority has voted to deny the motion to stay the mandate, the district court judge has discretion to await the outcome of the proceedings in the Supreme Court, just as we sometimes do before deciding a case involving an issue that the Supreme Court is hearing or has agreed to hear.

. While the Court of Appeals in Wald ultimately denied the application to stay the mandate based on its assessment that the Supreme Court was unlikely to reverse, the Supreme Court granted certiorari and reversed on the merits. See Regan v. Wald, 468 U.S. 222, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984).

. The amicus brief of the South African Organizations, Unions and Political Parties simply contains a brief expression of support for the amicus brief filed by the former Commissioners of the TRC.

. Because this goes to the issue of subject-matter jurisdiction, the fact that it was not argued by the defendants is not material. See Kontrick v. Ryan, 540 U.S. 443, 455, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004) (“A litigant generally may raise a court's lack of subject-matter jurisdiction at any time in the same civil action, even initially at the highest appellate instance.'').

. The majority declined to reach this issue, although at least one member of the majority recognized that the issue was an open one. See Khulumani v. Barclay Nat’l Bank Ltd., 504 F.3d at 283-84 n.18 (Op. of Judge Katzmann). Because it goes to the issue of subject-matter jurisdiction, the majority did not have the discretion to pass on it. See Kontrick, 540 U.S. at 455, 124 S.Ct. 906.